IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
—BROWNSVILLE DIVISION—

United States District Court
Southern District of Texas
ENTERED

FEB 2 0 2004

Michael N. Milby, Clerk of Court
By Deputy Clerk ⟋⟋⟋⟋

| | | |
|---|---|---|
| ALFONSO DELGADO, | § | |
| Plaintiff, | § | |
| | § | |
| VS. | § | |
| | § | CIVIL ACTION NO. B-02-179 |
| JO ANNE B. BARNHART, | § | |
| COMMISSIONER OF THE SOCIAL | § | |
| SECURITY ADMINISTRATION, | § | |
| Defendant. | § | |

## MEMORANDUM OPINION

The Plaintiff appeals from an administrative denial of Disability Insurance Benefits under the Social Security Act pursuant to 42 U.S.C. § 405(g). Docket No. 1. The case is presently before this Court via a Report and Recommendation rendered by Magistrate Judge John Wm. Black, to which the Plaintiff has timely objected. Docket Nos. 16-17. Having considered the Plaintiff's objections de novo , the Court hereby **SUSTAINS** the objections lodged by the Plaintiff in part, **REVERSES** the administrative decision, rejects the Magistrate's Report and Recommendation to the extent that it is inconsistent with this opinion, and **REMANDS** the matter back to Administrative Law Judge ("ALJ") for further proceedings consistent with this opinion.

## I.   BACKGROUND

### A.   The Administrative Decision

In the five-step disability determination inquiry prescribed by 20 C.F.R. § 404.1520, the ALJ proceeded to the fifth step. Record at 18-20. As a necessary predicate to reaching this fifth step, the ALJ first found that the claimant (a) was not engaged in substantial gainful activity, (b) had a severe medical impairment, (c) that was nonetheless not severe enough to automatically qualify for disability status under the regulations, but (d) was severe enough to preclude the claimant from engaging in his past relevant work. Record at 15-19. The fifth step requires an ALJ to assess the ability of a claimant who is incapable of engaging in his past relevant work to engage in other employment that accommodates his residual functional capacity, age, education, and work

experience and that exists in significant numbers in the national economy. 20 C.F. R. § 404.1520(a)(4)(v). If the claimant "cannot make an adjustment to other work, [the ALJ] will find [the claimant] disabled." Id. The Commissioner bears the burden of proof on this matter. Greenspan v. Shalala, 38 F.3d 232, 236 (5th Cir. 1994).

"Residual functional capacity" is defined as the most a claimant can still do in spite of the limitations imposed by his medical condition. 20 C.F.R. § 404.1545(a)(1). The ALJ found that "the claimant retains the following residual capacity: he can do light work, frequently lifting 10 pounds, occasionally lifting 20 pounds, standing and walking six hours out of an eight hour day." Record at 18, 20; see also 20 C.F.R. § 404.1567(b) (defining "light work"). However, the ALJ further found that the Plaintiff's ability to engage in "light work," although substantial, was somewhat truncated by certain nonexertional limitations (i.e., inability to engage in repetitive bending, stooping, crawling or climbing). Record at 18-19, 21. Regarding age and education, the ALJ found Plaintiff to be "a younger individual" possessed of "a limited education" as those phrases are defined in the regulations. Id. at 19, 21. Regarding work experience, the ALJ determined that "[t]he claimant has no transferable skills from any past relevant work and/or transferability of skills is not an issue in this case." Id. at 21. Elsewhere, the ALJ flatly stated that "transferability of skills is not an issue." Id. at 19.

The ALJ then juxtaposed these findings with the Medical-Vocational Guidelines ("Guidelines") located in 20 C.F.R. Pt. 404, Subpt. P, App. 2, which are also known as the "Grids." Record at 19. As Plaintiff has additional nonexertional limitations, as defined in 20 C.F.R. § 1569a(c)(1)(vi), that restricted him from engaging in the complete range of light work, the ALJ employed the Grids "as a framework for decision-making" as per 20 C.F.R. § 404.1569a(c)(2). Record at 19, 21. Specifically referencing Rules 202.10-12 and 202.17-19, and relying on the testimony of a vocational expert, the ALJ determined that there are sufficient jobs in the economy available to the Plaintiff in spite of his impairment and that he consequently was not disabled as that term is defined in the Social Security Act. Id. at 19-21.

**B.    The Plaintiff's Appeal**

Regarding the administrative decision, the Plaintiff complains of the ALJ's use of the

2

Medical-Vocational Guidelines as a mere decisional framework. Docket No. 11. Plaintiff maintains that the factual record is such that, if certain additional findings had been rendered, the Medical-Vocational Guidelines Rule 202.09 would be dispositive and would direct a finding of "disabled." Id. In particular, Plaintiff complains that the ALJ neglected to make critical findings regarding Plaintiff's (a) ability to communicate in English and (b) the transferability of Plaintiff's existing work skills. Id. The Plaintiff, therefore, requests, among other things, that this matter be remanded for further proceedings pursuant to the fourth sentence of 42 U.S.C. § 405(g). Id.

The Defendant advances two principal contentions in response. First, she asserts that the ALJ did effectively render a finding concerning the Plaintiff's language abilities by determining that Plaintiff possessed a "limited education." Docket No. 14. This is purportedly so because "limited education" comprises "a distinctive educational category and includes the ability to communicate in English to a level that would allow [the Plaintiff] to perform most unskilled jobs." Id. Accordingly, the Defendant maintains that, on appeal, the real issue is not Plaintiff's English language abilities, but rather "whether there is substantial evidence to support the ALJ's finding that [the Plaintiff] has a limited education." Id. The Defendant argues that such substantial evidence does exist in the record. Id. Second, the Defendant advocates that there is no need for a determination regarding skills transferability on account of the fact that the vocational expert solely identified unskilled jobs (i.e., jobs that require no skill whatever, transferable or otherwise).

The Magistrate Judge recommended that the Court reject both of the Plaintiff's aforementioned contentions and affirm the ALJ's decision. Docket No. 16. The Plaintiff objected to this recommendation and has re-raised both of his arguments. Docket No. 17. Accordingly, both of Plaintiff's contentions are now properly before this Court for resolution.

## II.   STANDARD OF REVIEW

### A.   Review of the Magistrate Judge's Decision

The applicable statute and its implementing rule in the Federal Rules of Civil Procedure provide for de novo review of matters addressed by a Magistrate Judge provided that a timely objection thereto is filed. 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72(b). Timely objection was filed. Docket No. 17. Accordingly, the Court must review the matters raised anew and need not "accord

any weight at all to the recommendations or findings of the magistrate judge." 12 CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 3070.2 (2d ed. 1997).

**B.    Review of Social Security Benefits Decisions**

Although the Court is free to disregard the Magistrate Judge's Report and Recommendation, it must afford greater deference to the ALJ's decision. "The judicial role in social security matters . . . is limited by 42 U.S.C. § 405(g)." Dellolio v. Heckler, 705 F.2d 123, 125 (5th Cir. 1983). A district court's review of the administrative decision is limited to determining two things: (1) whether the ALJ's factual findings are "supported by substantial evidence on the record as a whole," and (2) whether the ALJ "applied the proper legal standard." Greenspan, 38 F.3d at 236 (citing 42 U.S.C. §§ 405(g), 1383(c)(3)).

**1.    Evidentiary Matters**

In general, "[s]ubstantial evidence is 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Id. (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)). In order to cross the threshold of substantiality, evidence "'must do more than create a suspicion of the existence of a fact to be established.'" Johnson v. Bowen, 864 F.2d 340, 343 (5th Cir. 1988) (quoting Hames v. Heckler, 707 F.2d 162, 164 (5th Cir. 1983)). That is, substantial evidence "is more than a mere scintilla, and less than a preponderance." Spellman v. Shalala, 1 F.3d 357, 360 (5th Cir. 1993). In assessing the substantiality of the evidence, courts generally focus on four factors: "(1) objective medical facts; (2) diagnoses and opinions of treating and examining physicians; (3) the claimant's subjective evidence of pain and disability; and (4) his age, education, and work history." Martinez v. Chater, 64 F.3d 172, 174 (5th Cir. 1995).

District courts "may not reweigh the evidence in the record, nor try the issues de novo, nor substitute [their] judgment for that of the [Commissioner], even if the evidence preponderates against the [Commissioner's] decision." Johnson, 864 F.2d at 343. Provided that the correct legal standards are applied, when "substantial evidence supports the [Commissioner's] findings, they are conclusive and must be affirmed." Spellman, 1 F.3d at 360. Under this standard of review, some records could undoubtedly justify "either a finding of disability or a finding of no disability." Singletary v. Bowen,

4

798 F.2d 818, 826 (5th Cir. 1986) (Hill, J., concurring). In such instances, the Commissioner or her representatives (i.e., ALJs and the Appeals Council) are "entrusted with making a wise application of the correct legal standards to the facts of [the] case." Id. "Conflicts in the evidence are for the [Commissioner] and not the courts to resolve." Selders v. Sullivan, 914 F.2d 614, 617 (5th Cir. 1990) (per curiam).

Nevertheless, "'[t]his standard of review is not a rubber stamp for the [Commissioner's] decision and involves more than a search for evidence supporting the [Commissioner's] findings.'" Cook v. Heckler, 750 F.2d 391, 393 (5th Cir. 1985) (quoting Tome v. Schweiker, 724 F.2d 711, 713 (8th Cir. 1984)). "[A] simple search of the record for isolated bits of evidence which support the [Commissioner's] decision" is inadequate. Singletary, 798 F.2d at 823. Courts must consider the record below as a whole "'and take into account whatever fairly detracts from the substantiality of evidence supporting the [Commissioner's] findings.'" Cook, 750 F.2d at 393 (quoting Tome, 724 F.2d at 713); see also Randall v. Sullivan, 956 F.2d 105, 109 (5th Cir. 1992) (stating that courts must "scrutinize the record in its entirety to determine the reasonableness of the decision reached by the [Commissioner] and whether substantial evidence exists to support it"); Singletary, 798 F.2d at 823 ("We must consider the record as a whole."); Western v. Harris, 633 F.2d 1204, 1207 (5th Cir. 1981) (acknowledging that the court's review is limited, but also stressing that the record as a whole must be examined to determine the reasonableness of the Commissioner's decision).

### 2.    Legal and Procedural Matters

If substantial evidence supports the Commissioner's decision, then the only other potential ground for reversal is the application of an erroneous legal or procedural standard. See Cook, 750 F.2d at 392-93 ("If substantial evidence supports the administrative finding, we may then only review whether the administrative law judge applied the proper legal standards and conducted the proceedings in conformity with the applicable statutes and regulations."). No deference is afforded the Commissioner's legal determinations; review of legal issues is de novo. See Western, 633 F.2d at 1206 ("Of course, no similar presumption of validity attaches to the [Commissioner's] conclusions of law, including determinations of the proper standards to be applied in reviewing claims and the proper allocation of the burden of proof."). Generally speaking, reversal and remand with

5

appropriate instructions is the proper remedy when the law has been incorrectly assessed or applied in the administrative proceedings. See Leidler v. Sullivan, 885 F.2d 291, 294 (5th Cir. 1989) ("Where, however, the [Commissioner] has relied on erroneous legal standards in assessing the evidence, he must reconsider that denial."). However, in instances in which the error did not affect the substantial rights of a claimant for Social Security benefits, such error will be overlooked. See Morris v. Bowen, 864 F.2d 333, 335 (5th Cir. 1988) ("[P]rocedural improprieties . . . will . . . constitute a basis for remand only if such improprieties would cast into doubt the existence of substantial evidence to support the ALJ's decision."); Mays v. Bowen, 837 F.2d 1362, 1364 (5th Cir. 1988) (per curiam) ("Procedural perfection in administrative proceedings is not required. This court will not vacate a judgment unless the substantial rights of a party have been affected. . . . The major policy underlying the harmless error rule is to preserve judgments and avoid waste of time.") (internal citations omitted).

## III.    DISCUSSION

### A.    The Medical-Vocational Guidelines

As previously noted, the Commissioner bears the burden of proof at the fifth step of the administrative disability determination prescribed by 20 C.F.R. § 404.1520. Greenspan, 38 F.3d at 236. Generally speaking, "[t]he Commissioner can meet this burden through the testimony of a vocational expert or by reference to the Medical-Vocational Guidelines." Thomas v. Barnhart, 278 F.3d 947, 955 (9th Cir. 2002). "'In the ordinary case,' the Commissioner meets his burden at the fifth step 'by resorting to the applicable medical vocational guidelines (the grids).'" Rosa v. Callahan, 168 F.3d 72, 78 (2d Cir. 1999) (quoting Bapp v. Bowen, 802 F.2d 601, 604 (2d Cir. 1986)). Employment of the Guidelines "obviate[s] the need for a vocational expert's testimony." Daniels v. Apfel, 154 F.3d 1129, 1132 (10th Cir. 1998); accord Hernandez v. Heckler, 704 F.2d 857, 863 (5th Cir. 1983).

When applicable, the Medical-Vocational Guidelines are binding "at all levels of adjudication and appeal." SSR 82-41 at *1, available at 1982 WL 31389; see also 20 C.F.R. § 402.35(b)(1) ("We publish Social Security Rulings in the Federal Register under the authority of the Commissioner of Social Security. They are binding on all components of the Social Security

6

Administration. These rulings represent precedent final opinions and orders and statements of policy and interpretations that we have adopted."). Administrative failure to comply with a Social Security Ruling is grounds for reversal and remand when such failure occasions prejudice. Hall v. Schweiker, 660 F.2d 116, 118-19 (5th Cir. 1981) (per curiam) (reversing and remanding on account of ALJ's failure to comply with SSR in case in which prejudice resulted from noncompliance).

As one might gather from their applicability at the fifth step of the administrative inquiry, the Guidelines exist to guide disability determinations "in cases which cannot be evaluated on medical considerations alone" (i.e., cases in which vocational factors and residual functional capacity are outcome determinative). 20 C.F.R. Pt. 404, Subpt. P, App. 2, § 200.00(a). A finding of disability or non-disability at this stage of the five-step inquiry is not a medical determination. Rather, the Grid Rules enable administrative law judges to take administrative notice of the existence or nonexistence of available jobs in the economy for which a claimant is qualified. 20 C.F.R. Pt. 404, Subpt. P, App. 2, § 200.00(b); see also SSR 83-10 at *3, available at 1983 WL 31251 ("When the medical-vocational rules were promulgated, administrative notice was taken of the fact that it was possible to identify . . . numerous jobs in the national economy."). Hence, when all of the administrative fact-findings coincide with the a particular Grid Rule's criteria, "the existence [or nonexistence] of such jobs is established." 20 C.F.R. Pt. 404, Subpt. P, App. 2, § 200.00(b).

The various rules promulgated in Appendix 2 are first divided into four categories based upon a claimant's residual functional capacity and then each category is subdivided into a grid or chart that accounts for the claimant's age, education, and prior work experience. Id. Based on these factors, a determination of "disabled" or "not disabled is indicated." Id. Each category of the Grid Rules is also prefaced by commentary that clarifies how the rules are to be applied. Id. at §§ 201-04.

"Where the findings of fact made with respect to a particular individual's vocational factors and residual functional capacity coincide with all of the criteria of a particular rule, the rule directs a conclusion as to whether the individual is or is not disabled." Id. at § 200.00(a); see also Salinas v. Schweiker, 662 F.2d 345, 348 (5th Cir. 1981). The Guidelines do not always dictate a determinate outcome, however, because "[t]he rules in Appendix 2 do not cover all possible variations of factors." 20 C.F.R. § 404.1569. Accordingly, in cases in which a claimant's residual functional capacity or vocational factors (i.e., age, education, work experience) do not precisely match a

7

particular Grid Rule's criteria, the Guidelines are not dispositive. Id.; 20 C.F.R. Pt. 404, Subpt. P, App. 2, § 200.00(b), (d); see also Thomas, 666 F.2d at 1003 & n.7; Perez v. Schweiker, 653 F.2d 997, 1000-01 (5th Cir. 1981). Instead, the Guidelines "are used, in conjunction with the definitions and discussions in the text of the regulations, as guidance for decisionmaking" in such instances. SSR 83-10 at *1.

The Guidelines never direct a conclusion of "disabled" or "not disabled" when a claimant has significant nonexertional limitations. 20 C.F.R. Pt. 404, Subpt. P, App. 2, § 200.00(e)(1); 20 C.F.R. § 404.1569a(c)(2); see also Hernandez, 704 F.2d at 861 (agreeing with contention that the Guidelines are not controlling when a claimant's impairments are nonexertional). When nonexertional limitations are involved, "[t]he determination as to whether disability exists will be based on the principles in the appropriate sections of the regulations, giving consideration to the rules for specific case situations in appendix 2." 20 C.F.R. § 404.1569a(c)(2); accord 20 C.F.R. Pt. 404, Subpt. P, App. 2, § 200.00(e)(1). If the circumstances of a claimant's case "correspond to (or closely approximate) the factors of a particular rule, the adjudicator then has a frame of reference for considering the jobs or types of work precluded by other, nonexertional impairments in terms of numbers of jobs remaining for a particular individual." 20 C.F.R. Pt. 404, Subpt. P, App. 2, § 200.00(d) (emphasis added).

In instances in which the Guidelines merely serve as a decisional framework (e.g., when significant nonexertional limitations are involved), the ALJ may not simply take administrative notice of jobs existing in the economy and must, therefore, satisfy his burden of proof in some other fashion, most typically via the testimony of a vocational expert. See Carey v. Apfel, 230 F.3d 131, 147 (5th Cir. 2000) (finding no error in ALJ's use of Grid Rules for guidance because ALJ consulted a vocational expert for further evidence); Newton v. Apfel, 209 F.3d 448, 458 (5th Cir. 2000) ("If, however, the claimant suffers from nonexertional impairments or a combination of exertional and nonexertional impairments, then the Commissioner must rely on a vocational expert to establish that such jobs exist in the economy."); Fraga v. Bowen, 810 F.2d 1296, 1304 (5th Cir. 1987) (holding that, when the Grids are not dispositive, an "ALJ must rely upon expert vocational testimony or other similar evidence to establish that such jobs exist."); Lawler v. Heckler, 761 F.2d 195, 197-98 (5th Cir. 1985) (per curiam) (holding that "expert vocational testimony" should have been introduced due

8

to fact that facts did not precisely align with the Grids); Dellolio, 705 F.2d at 128 (holding that "expert vocational testimony is required" when the Guidelines are not dispositive).

## B.    Application of the Guidelines in This Case

The ALJ concurred with the medical expert's opinion that "the claimant could do light work with no repetitive bending, stooping, crawling or climbing." Record at 17; see also id. at 18 (finding that Plaintiff's residual functional capacity is limited by an inability to engage in "repetitive bending, stooping, crawling or climbing"); id. at 20-21 (setting out "findings" in explicit fashion and noting the aforementioned limitations). These restrictions constitute nonexertional limitations. 20 C.F.R. § 404.1569a(c)(1)(vi). Therefore, as a matter of law, the ALJ could not exclusively rely on the Medical-Vocational Guidelines. See supra Part III.A. Accordingly, Plaintiff's argument that Grid Rule 202.09 might be dispositive once the appropriate factual inquiries are made, see Docket Nos. 11, 17, is without merit.

In this case, the ALJ was obligated to employ the Guidelines as no more than a mere framework in arriving at his decision. See supra Part III.A. This is precisely what the ALJ did. See Record at 19 ("The Medical-Vocational Guidelines are used as a framework for the decision when the claimant cannot perform all of the exertional demands of work at a given level of exertion and/or has nonexertional limitations."); id. at 20 ("A finding of 'not disabled' is therefore reached within the framework of Medical-Vocational Rule[s] 202.17, 202.18, 202.19, 202.10, 202.11, and 202.12."); id. at 21 ("Although the claimant's exertional limitations do not allow his to perform the full range of light work, using Medical-Vocational Rule[s] 202.17, 202.18, 202.19, 202.10, 202.11 and 202.12 as a framework for decision-making, there area significant number of jobs in the national economy that he could perform."). The ALJ considered these Grid Rules in conjunction with the testimony of a vocational expert. See Record at 47-52 (testimony of vocational expert); id. at 19-20 (discussing testimony of the vocational expert). When circumstances preclude the taking of administrative notice of jobs available in the economy, an ALJ may carry his burden of proof via the testimony of an expert at the fifth step of the disability inquiry. See supra Part III.A. Therefore, the only questions remaining are: (1) whether the ALJ applied the proper legal standards in employing the Medical-Vocational Guidelines; and (2) whether the ALJ's decision is supported by substantial

evidence.

### C.    The Plaintiff's Language Abilities

The Guidelines relied on as a framework by the ALJ all have one thing in common: they are all predicated on an educational level that includes some ability in English. The "education" category of the Guidelines includes several possible results: varying levels of "[h]igh school graduate or more," "[l]imited or less—at least literate and able to communicate in English," "[l]imited or less," and "[i]lliterate or unable to communicate in English." 20 C.F.R. Pt. 404, Subpt. P, App. 2. None of the rules relied on by the ALJ, see supra Part III.B., pertain to a claimant who is illiterate or unable to communicate in English. See 20 C.F.R. Pt.404, Subpt. P, App. 2, §§ 202.10-12, 202.17-19.

Regarding the Plaintiff's language ability, the ALJ specifically found that he can both "read and write English a little" and "read a newspaper and can read simple instructions." Record at 17. More generally, the ALJ determined that Plaintiff is possessed of "'a limited education.'" Id. at 21. By regulatory definition, "[l]imited education means ability in reasoning, arithmetic, and language skills, but not enough to allow a person with these educational qualifications to do most of the more complex job duties needed in semi-skilled or skilled jobs." 20 C.F.R. § 404.1564(b)(3).

### 1.    The Evidence in the Record

The ALJ's opinion does not discuss the basis for his findings with respect to the Plaintiff's language skills, but the administrative record is not devoid of evidence related to this matter. In an application for disability benefits, Form SSA-3368-BK (7/98), which was presumably completed by someone else on the Plaintiff's behalf,[1] the Plaintiff indicates that he cannot speak or read English. Record at 100. He likewise represents that he cannot write more than his name in English.[2] Id. A

---

[1] There does not appear to be any testimony on this point, but this conclusion is inferred this from the markedly different handwriting styles that appear on Plaintiff's Social Security Disability Report (Form SSA 3368-BK (7/98)), see Record at 100-09, and because of his indication that he cannot read English.

[2] Setting aside for the moment whatever the appropriate legal standard might be, as a matter of common sense Plaintiff's representation that he can write his own name in English is hardly indicative of

1998 admission assessment form from Valley Regional Medical Center that was apparently completed by a hospital staff member lists "Spanish" as the language spoken in a manner that appears to preclude like ability in English. Id. at 180. However, there are also indications somewhat to the contrary. In an assessment of the Plaintiff's medical condition, Oliver Achleitner, M.D., wrote that, "[o]n examination, the patient speaks poor English but fluent Spanish." Id. at 143. A second Valley Regional Medical Center document suggests that any corresponding ability to comprehend English must be substantially limited though. See id. at 183 ("The myelographic procedure was explained to the patient in detail by the Chief Special Procedures Technologist, who is bilingual.").[3]

The primary language-related evidence consists of the Plaintiff's own testimony during the July 12, 2000 hearing before the ALJ. See id. at 27-44 (Plaintiff's testimony). At the outset of the hearing, an interpreter was "duly sworn." Id. at 25; see also id. at 26 ("At this point in time, I'm going to first place our interpreter under oath."). However, it is unclear to what extent the interpreter's services were required. Shortly after administering the oath, the ALJ stated to the interpreter, "I'll just ask you to pitch in as necessary." Id. at 27. Prior to this request, the Plaintiff had already answered some basic questions. See id. The timing of the ALJ's request, perhaps, suggests that the prior questions were propounded and answered in English, but this is mere speculation.[4] Unfortunately, the transcript does not note when and to what extent the interpreter was

English language skills. The Plaintiff "completed 12 years of schooling in Mexico." Record at 17. On the form discussed above, he represents that he speaks Spanish. Id. at 100. From the record as a whole, it is obvious that his native tongue is Spanish. The Spanish and English alphabets are almost identical. They employ the same basic Latin characters. For a native of the Spanish language, being able to write one's name in English simply consists of writing it in Spanish without any of the accent marks that might otherwise be necessary in the latter language.

[3] It may also be that the apparent discrepancies in these documents regarding the Plaintiff's English language ability reflects proficiency gained over time. The two Valley Regional Medical Center documents are dated July 15, 1998 and November 7, 1998 respectively. Record at 180, 183. The letter prepared by Dr. Achleitner is dated April 10, 2000. Id. at 143. Perhaps, Plaintiff's ability to "speak[] poor English" developed in the interim. During the administrative hearing, the Plaintiff's representative stated, "With great pride, he's learning, Your Honor," regarding the Plaintiff's proficiency in the English language. Id. at 28.

[4] One could speculate in the opposite direction on the basis of other testimony. For example, when asked to read a passage from a newspaper story, the Plaintiff's initial response was, "In English?" Record at 28. Perhaps, this suggests that he was not previously answering in English.

11

actually called upon to interpret. Instead, the transcript distinguishes the interpreter's involvement solely when he spoke in English directly to the ALJ. See, e.g., id. at 34, 36-38. At least one of these passages, perhaps, indicates that the interpreter was not engaged in translating for the Plaintiff with any great frequency, see id. at 37 ("ALJ: 'Bare with me. Let me read what he said and I'd like you to translate, Mr. Cole.' INT: 'Okay.'"), but such an indication is only an inference drawn from the record and not a very strong one. Speculation of this sort is not a substitute for substantial evidence, of course. See White ex rel. Smith v. Apfel, 167 F.3d 369, 375 (7th Cir. 1999) ("Speculation is, of course, no substitute for evidence, and a decision based on speculation is not supported by substantial evidence.").

The Plaintiff's actual testimony regarding his English language ability is equally problematic. His testimony on this subject is limited in nature and takes up about a page and a half of approximately twenty-seven total pages of testimony. The relevant passage reads as follows:

ALJ:    How many years have you completed in this country?

Π:      In this country? I never went to school in this country.

ALJ:    Okay. How many years of school have you completed in Mexico?

Π:      Maybe 12 years.

ALJ:    Okay. Can you read and write in English?

Π:      In English, not too much, a lot of stuff, a little bit.

ALJ:    A little bit?

Π:      Yes.

ALJ:    Can you read and understand a newspaper?

Π:      Yes, (INAUDIBLE).

ALJ:    All right. Let the record reflect that I have with me today The Houston Chronicle.

Π:      Yes.

12

ALJ:    And I will tender it to you, Mr. Delgado, and ask that you read the headline and then come down to the first paragraph.

II:      In English?

ALJ:    In English.

II:      All right. (INAUDIBLE), President Clinton argued the Israeli and Palestine leaders (INAUDIBLE) a reasonable compromise to the (INAUDIBLE) Camp David in high stakes. (INAUDIBLE).

ALJ:    Okay. Go ahead and read the first paragraph then.

II:      Summit hits on the wake of (INAUDIBLE). That's okay?

REP:[5]   Yeah. The first paragraph.

II:      Clinton told Prime Minister (INAUDIBLE) Yesser Arrafat (Phonetic) that they must move (INAUDIBLE) of the evidence between their people. More?

ALJ:    That should be sufficient.

II:      Okay.

REP:    With great pride, he's learning, Your Honor.

ALJ:    Okay. Pass that over. Thank you. All right. Let me recap it. Summit gets under way at Camp David. Clinton called it, "point of no return." (INAUDIBLE) Thurma (Phonetic), Maryland, President Clinton urged the Israeli and Palestine leaders to seek a "principle compromise" Tuesday as he opened the Camp David summit in a high stakes bid to resolve the remaining obstacles to a long sought (INAUDIBLE) peace agreement. All right. Dr. Vander-Molen, I draw your experience but it sure sounds like he is above marginal and limited in terms of educational capacity?

VE:[6]    It would appear to me that he would be able to read simple instructions on a

---

[5] The "REP" notation refers to the Plaintiff's non-attorney representative.

[6] The "VE" notation refers to the vocational expert consulted by the ALJ during the administrative hearing. The VE also testified separately after the Plaintiff. See Record at 47-51. During his testimony, the VE assessed the Plaintiff's educational level "at the low end of limited" on the basis of the Plaintiff's

job.

ALJ:    Okay. All right. Let me note that down—simple instructions. All right.

Record at 27-29.[7]

Given the inaudibility of much of the Plaintiff's testimony, it is not clear how much of the story he was actually capable of reading aloud. Nor is it clear to what extent the transcript reflects transcription errors as opposed to errors during the Plaintiff's recitation.[8] It likewise bears noting that the cold record does not divulge errors of pronunciation. More importantly, it is not clear to what extent the Plaintiff understood the content of the material that he read aloud. The overall state of the record makes it very difficult on review to conclude that substantial evidence exists in support of the ALJ's conclusions concerning the Plaintiff's ability, read, and understand English.

### 2.    Proper Legal Standard For Assessing Language-Related Evidence

The foregoing is the sum total of the evidence in the record pertaining to the Plaintiff's level of proficiency in the English language. When viewed in conjunction with the requisite legal

---

"reading demonstration." Id. at 48.

[7] The article from which the Plaintiff read is available via Westlaw. Greg McDonald, Summit Gets Under Way/Clinton: 'Point of No Return', HOUS. CHRON., July 12, 2000, at 1, available at 2000 WL 4310569. Based on the Plaintiff's testimony, he appears to have read the title of the article as well as the first two paragraphs. The first two paragraphs read in full:

> THURMONT, Md. – President Clinton urged the Israeli and Palestinian leaders to seek to seek a "principled compromise" Tuesday as he opened the Camp David summit in a high-stakes bid to resolve the remaining obstacles to a long-sought Middle East peace agreement.
>
> Declaring the two sides "have passed the point of no return," Clinton told Israeli Prime Minister Ehud Barak and Palestinian leader Yasser Arafat that they must move forward to end more than a half-century of violence between their people.

Id.

[8] Consider, for example, how the court reporter attributes the phrase "Palestine leaders" to both the ALJ and the Plaintiff. Did one or both commit the same error in their recitation/pronunciation? Or, perhaps, did neither party commit the error in question (i.e., is it merely an error of transcription)? It is impossible to say which is the case.

14

standards for assessing literacy and language skills, this record is insufficient to support the ALJ's findings on this issue. Although merely used as a framework for decision, the Grid Rules relied upon by the ALJ all assume a certain level of proficiency in the English language. The evidence, however, does not lend support to this assumption even under the deferential substantial evidence standard of review.

One of the educational levels specified in the Grid Rules is "[i]lliterate or unable to communicate in English." See generally 20 C.F.R. Pt. 404, Subpt. P, App. 2. The two concepts are separately defined for purposes of the regulations. "Illiteracy means the inability to read or write." 20 C.F.R. § 404.1564(b)(1). Someone is considered "illiterate if the person cannot read or write a simple message such as instructions or inventory lists even though the person can sign his or her name." Id. The regulations indirectly define ability to communicate as "the ability to speak, read and understand English." 20 C.F.R. § 404.1564(b)(5). Although clearly interrelated and overlapping in most respects, each concept does not necessarily embrace every aspect of the other. For example, the ability to write is addressed by "literacy," but apparently not by "ability to communicate." In general, the Social Security Administration regards the illiterate as a subcategory of those who are unable to communicate in English. See Social Security Acquiescence Ruling 86-3(5) at *2, available at 1986 WL 68649 ("Illiteracy is subsumed under inability to communicate in English."). However, as a consequence of the Fifth Circuit's holding in Martinez v. Heckler, 735 F.2d 795 (5th Cir. 1984), ALJs in this circuit are instructed that, "when illiteracy and inability to communicate in English are alleged or appear to be in question, findings with respect to both issues must be made." SSAR 86-3(5) at *2. The general Social Security regulations that apply across all circuits state that ALJs will ask claimants "how long [they] attended school and whether [they] are able to speak, understand, read and write in English" in assessing their educational level as a vocational factor.[9]

---

[9] As previously noted, see supra note 2, the Plaintiff completed all of his formal schooling in Mexico. Given that "[t]he term education also includes how well [one] is able to communicate in English," 20 C.F.R. § 404.1564(b), formal education in Mexico is likely of limited value in assessing the Plaintiff's present educational level for purposes of the Social Security regulations. Additionally, "formal education . . . completed many years before [one's] impairment began . . . may no longer be useful or meaningful in term's of [one's] ability to work." 20 C.F.R. § 1564(b); see also 20 C.F.R. Pt. 404, Subpt. P, App. 2, § 200.00(g) ("For [individuals approaching advanced age, ages 50-54] even a high school education or more (ordinarily completed in the remote past) would have little impact for effecting a vocational adjustment

The ALJ concluded that the Plaintiff "can read and write English a little." Record at 17. This conclusion coincides with the Plaintiff's own testimony in response to questions propounded by the ALJ. See id. at 27-28 (question and answer series in which Plaintiff affirms that he can read and write a little bit in English). Nonetheless, the Plaintiff's writing abilities in English are not clear from the record. The Plaintiff initially offered contradictory assessments of his abilities and then concurred with the ALJ's suggestion of "[a] little bit." Id. at 27-28. Unfortunately, "[a] little bit" remains unqualified and undefined. Is the Plaintiff able, for example, to "write a simple message such as instructions or inventory lists"? See 20 C.F.R. § 404.1564(b)(1). Such a determination is critical to an assessment of literacy. Id.; see also Dixon v. Heckler, 811 F.2d 506, 510 (10th Cir. 1987) ("On this record, there is simply no indication that [the claimant] could 'write a simple message, such as instructions or inventory lists,' as required by the . . . regulations for a finding of literacy.").

The ALJ is far more thorough in gauging the Plaintiff's reading abilities. Although the transcript is less complete than might be desired, it does give some real content to the descriptive phrase "[a] little bit" with regard to the Plaintiff's ability to read English, see Record at 28, a factor that is taken into account both for purposes of assessing literacy and ability to communicate in English. 20 C.F.R. §§ 404.1564(b)(1), (5). On the basis of the Plaintiff's reading, a vocational expert concluded that "he would be able to read simple instructions on a job" and that he was "at the low end of limited" in terms of education. Record at 29, 48. The Plaintiff's recitation of the Houston Chronicle article may also provide some indication of the Plaintiff's ability to speak English as well, a fact relevant to a determination of his ability to communicate in English under 20 C.F.R. § 404.1564(b)(6). However, the ability to read from written materials is not precisely the same thing as the ability to speak a language.[10] See Chavez v. Dept. of Health and Human Servs., 103 F.3d 849,

---

unless relevant work experience reflects use of such education."). Accordingly, to whatever extent the ALJ relied on Plaintiff's formal schooling, see Record at 17 ("He completed 12 years of schooling in Mexico."), such reliance is open to question.

[10] To the extent that the Plaintiff spoke English during the administrative hearing in response to questions put to him by the ALJ, the latter clearly would have had the opportunity to assess the former's capacity for speech. However, as previously noted, the extent to which the Plaintiff spoke English or Spanish during the hearing is not clear from the record. The ALJ does not discuss the issue in his opinion. The

852 (9th Cir. 1996) ("[A]s a matter of common knowledge, many educated individuals can read, if haltingly, English publications, while wholly unable to keep up a conversation in the language."). Moreover, the ALJ's inquiries failed to ascertain the extent to which the Plaintiff understood the words and sentences that he read aloud. The regulations explicitly factor such comprehension into an analysis of the ability to communicate in English. See 20 C.F.R. § 404.1564(5) (distinguishing between "the ability to speak, read and understand English") (emphasis added). Likewise, the regulations obligate ALJs to inquire into a claimants ability to "speak, understand, read and write in English." 20 C.F.R. § 404.1564(b)(6) (emphasis added). The failure to probe the Plaintiff's understanding of the passage that he read or inquire more generally regarding his English comprehension is not a trifling matter. It goes to the heart of an assessment of a claimant's literacy. The ability to read cannot be fully gauged on a claimant's ability to recite from a script. An oral recitation tests many things (e.g., character recognition, pronunciation), but comprehension is not necessarily one of them.

The ALJ's cumulative failures to make and/or document the relevant inquiries regarding Plaintiff's language abilities deprives his finding on this matter of substantial supporting evidence. See Silveira v. Apfel, 204 F.3d 1257, 1261 (9th Cir. 2000) (per curiam) ("The Commissioner bears the burden of establishing that [the claimant] is literate."); Rosa, 168 F.3d at 82-83 (holding that, when evidentiary gaps exist in the record, remand for the development of additional evidence is appropriate); Pierre v. Sullivan, 884 F.2d 799, 802 (5th Cir. 1989) (per curiam) ("It is the duty of the ALJ to fully and fairly develop the facts relative to a claim for benefits. When he fails in that duty, he does not have before him sufficient facts on which to make an informed decision . . . . [and] his decision is not supported by substantial evidence."). While this Court does not discount the ALJ's ability to analyze the demeanor of the Plaintiff and arrive at conclusions about the Plaintiff's ability to communicate in and comprehend English on the basis thereof, the record in this case does not support the ultimate conclusion. Therefore, if Plaintiff's language ability is the dispositive issue, reversal and remand are appropriate. See Silveira, 204 F.3d at 1261-62 ("The ALJ made no express finding that [the claimant] was literate in English, and there is insufficient evidence in the record to

---

record is silent on the matter. As ALJs carry the burden of proof at this stage of the disability inquiry, Greenspan, 38 F.3d at 236, this silence must be construed against the Social Security Administration.

determine whether or not he is literate in English. Therefore, we remand Silveira's case for a finding as to this issue.").

### D.    The Plaintiff's Prior Work Experience

Although the Plaintiff's past relevant work is categorized as "skilled," Record at 47, the ALJ found that the Plaintiff is "unable to perform any of his past relevant work." Id. at 21. Accordingly, the ALJ further found that the Plaintiff "has no transferable skills from any past relevant work and/or transferability of skills is not an issue in this case." Id. Earlier in his opinion, he simply indicated that "[t]he transferability of skills is not an issue in this case." Id. at 19.

The relevant Medical-Vocational Guidelines feature multiple categories regarding a claimant's previous work experience: "[u]nskilled or none," "[s]killed or semiskilled—skills not transferable," "[s]killed or semiskilled—skills transferable." See generally 20 C.F.R. Pt. 404, Subpt. P, App. 2, §§ 202.01-22. Given the ALJ's findings, those Grid rules pertaining to claimants whose skills are transferable are unsuitable for use as a framework for the ALJ's decision in this case. Nonetheless, as previously noted, the ALJ relied on Rules 202.10-12 and 202.17-19 in reaching his decision. Even if they were appropriate with regard to the other two categories (i.e., age and education), Rules 202.12 and 202.19 pertain solely to those claimants whose skills are transferable. As such, their use as part of the framework employed by the ALJ in arriving at his decision was legally improper as well.[11]

## IV.    CONCLUSION

This is not a case in which the Guidelines are dispositive. See supra Part III.A. No one Grid Rule controls the outcome. Id. Instead, the ALJ employed various Grid Rules as a framework for rendering a decision. See supra Part III.B. In the instant case, however, the errors asserted by the

---

[11] Ignoring any other infirmity for the purpose of discussion, the other four of the six Rules relied on by the ALJ feature claimants whose work experience is either "[u]nskilled or none" or "skilled or semiskilled—not transferable." 20 C.F.R. Pt. 404, Subpt. P, App. 2, §§ 202.10-11, 202.17-18. Given the ambiguous nature of the Medical-Vocational Guidelines regarding claimants who have skilled work histories but whose skills are not transferable, see Silveira, 204 F.3d at 1260-61, either category is reasonable for use when the Grids merely operate as a framework for decision.

Plaintiff have affected the outcome of the Plaintiff's administrative hearing. Although Plaintiff's claim that Grid Rule 202.09 might be dispositive is mistaken as a matter of law, see supra Part III.A., said Rule may have been more appropriate in guiding this decision than the rules upon which the ALJ relied. At the time of the administrative hearing, the Plaintiff was 51 years of age, or "[c]losely approaching advanced age" in the terminology of the Medical-Vocational Guidelines.[12] Record at 27; 20 C.F.R. § 404.1563(d). When this factor is considered in conjunction with the ALJ's finding that the Plaintiff is limited to "a significant range of light work," Record at 21, and the fact that the Plaintiff is either unskilled or has no transferable skills in terms of previous work experience, see supra note 11 and accompanying text, the only Grid Rules that are suitable as a framework for decision-making are Rules 202.09, 202.10, 202.11, 202.13, and 202.14.

The only remaining factor to be taken into account is the Plaintiff's educational level, which will further narrow down the list of Grid Rules that are appropriate for use as a decisional framework

---

[12] There is another Grid-related legal error in the ALJ's decision that has not been raised by the parties, but which bears discussion nonetheless so that the proper legal standards are applied on remand. The ALJ's findings state that "[t]he claimant was a 'younger individual between the ages of 45 and 49' as of the alleged onset date." Record at 21. Half of the Grid Rules used as a framework for decision-making by the ALJ pertain to younger individuals, and half pertain to individuals closely approaching advanced age. Id. at 21; 20 C.F.R. §§ 404.1563(b)-(c). Earlier in his opinion, the ALJ noted both age categories based on Plaintiff's "alleged onset date" and his age the time of the hearing. Record at 19. The use of both categories in determining if the Plaintiff is disabled is erroneous.

In general, federal courts do not reassess a claimant's present age on appeal. See Maziarz v. Secretary of Health and Human Servs., 837 F.2d 240, 244 (6th Cir. 1987) ("[T]he district court and this court merely review the [Commissioner's] application of the grid; we do not reevaluate the relevant vocational factors, such as age, unless there is an error in the [Commissioner's] decision."). In this case, however, there is an error in the ALJ's determination of the Plaintiff's age. See id. ("[T]he relevant time for determining a claimant's age in applying the regulations is the date of the ALJ's decision."). Therefore, the ALJ should not have employed any of the Grid Rules that pertain to younger individuals as a framework for his decision.

The regulations do provide that ALJs will "use each of the age categories that applies to [a claimant] during the period for which [the ALJ] must determine if [the claimant] is disabled." 20 C.F.R. § 404.1563(b). Moreover, it is entirely possible that increased age might result in a claimant being disabled from one point in time but preclude disability prior thereto. See 20 C.F.R. Pt. 404, Subpt. P, §§ 202.00(c)-(d) (taking into consideration the vocational effects of aging). However, "[t]he fact that a claimant who is unable to engage in [substantial gainful] activity at the time of the decision may have been able to do so at some point in the past goes to the question of the onset date, not the question of disability." Varley v. Secretary of Health and Human Servs., 820 F.2d 777, 781 (6th Cir. 1987).

19

in this case.[13] An accurate assessment of his literacy and ability to communicate in English are critical to a proper assessment of the Plaintiff's educational level. The record before this Court indicates that the ALJ failed to employ the appropriate legal and procedural standards in assessing the Plaintiff's educational level, and as a result substantial evidence does not support the ALJ's prior assessment of the Plaintiff's educational level. Accordingly, reversal and remand is warranted in this case so that the ALJ may make the necessary fact-findings and adduce whatever additional evidence may be necessary in light of these facts (e.g., the testimony of a vocational expert). Therefore, the Court **SUSTAINS** the Plaintiff's objections in part, **REVERSES** the administrative decision, and **REMANDS** this matter to the ALJ for further proceedings in accordance with the legal standards articulated herein. Further, to the extent that this ruling is inconsistent with the Report and Recommendation of the United States Magistrate Judge, said Report and Recommendation is hereby rejected and the Plaintiff's objections thereto are sustained to the extent indicated herein.

Signed in Brownsville, Texas, this 19th day of February, 2004.

ANDREW S. HANEN
UNITED STATES DISTRICT JUDGE

---

[13] Given that the Plaintiff's actual educational level was not properly assessed at the administrative level and therefore remains undetermined, Grid Rules 202.13 and 202.14 are potentially applicable in some theoretical sense inasmuch as they correspond to claimants who are closely approaching advanced age with no transferable skills (or an unskilled work history) and who are limited to light work. However, as these two rules assume an educational level of "[h]igh school graduate or more" they are, in reality, almost certainly inapposite. See supra note 9.